THEODORE ALPERT, Plaintiff-Appellant, v. CHARLES E. BERTSCH *et al.*, Defendants-Appellees.

First District (6th Division)   No. 1—91—2731

Opinion filed September 11, 1992.—Rehearing denied October 27, 1992.

454

Donald M. Thompson, of Chicago, for appellant.

Patrick T. Driscoll, Jr., P.C., of Chicago, and Mark P. Wine and Robert J. McGillivray, both of Oppenheimer, Wolff & Donnelly, of Minneapolis, Minnesota, for appellees.

JUSTICE McNAMARA delivered the opinion of the court:

Plaintiff, Theodore Alpert, filed suit alleging breach of employment contract, breach of stock option contract, breach of fiduciary duty, breach of contract for medical insurance, interference with contract, invasion of privacy, defamation, common law fraud, and securities fraud against his former employer, International Cup Corporation (ICC) and four of the corporation's individual shareholders and directors. Nonresidents Charles E. Bertsch, Gene Monnin, and James Watkins (defendants) filed a special and limited appearance to quash service of process for lack of personal jurisdiction. The trial court granted the motion, finding that plaintiff had failed to show that defendants had performed any acts which would submit them to personal jurisdiction under the long-arm statute. (Ill. Rev. Stat. 1989, ch. 110, par. 2—209.) (Neither ICC nor defendant shareholder Donald J. Hesch, a resident of Illinois, is a party to this appeal.)

We adduce the following background from the affidavits, pleadings and documents filed. In 1988, plaintiff, an Illinois resident, approached Bertsch, a resident of Indiana, with a business proposition which involved the acquisition of the assets of Advance Cup Corporation, a paper cup company located in Bennettsville, South Carolina, which was involved in bankruptcy proceedings. Bertsch conferred with Hesch, Monnin and Watkins about this opportunity. Monnin and Watkins are residents of Ohio and Minnesota, respectively. In December 1988, Bertsch, Hesch, Monnin and Watkins, together with Sherwood Properties Limited Partnership (Sherwood Properties), formed a joint venture to start a corporation to purchase the assets of Advance Cup Corporation. On December 14, 1988, ICC was incorporated as a Delaware corporation, licensed to transact business in South Carolina. The stock holdings of Bertsch, Hesch, Monnin and Watkins represent 84.2% of the issued and outstanding shares.

The first meeting of the board of directors of ICC was held on February 20, 1989. Bylaws were adopted, and plaintiff, Bertsch,

Hesch and Monnin were elected as directors. Subscription agreements were also executed. On February 29, 1989, the bankruptcy court approved the sale of Advance Cup Corporation's assets for the sum of $1,300,000.

On April 1, 1989, plaintiff and ICC entered into a written employment agreement wherein plaintiff agreed to serve as the president of ICC for five years. ICC reserved the right to terminate plaintiff "for cause," which included the failure or refusal to perform duties under the agreement. The agreement provided that plaintiff would perform his duties at the principal executive offices in Bennettsville, South Carolina, and set forth a specified rate of compensation plus bonus, vacation, insurance and other employee benefits, as well as a stock option plan. The stock option plan permitted plaintiff to purchase 20% of the stock of ICC for $200,000, so long as he was employed by ICC. (Plaintiff owns 5.33% of the stock in ICC.) Plaintiff's affidavit indicates that on February 27, 1989, he moved to South Carolina to manage ICC; however, he continued to maintain a residence in Chicago, where his wife lived.

The original capital structure of ICC provided for the issuance of 10,000 shares with a par value of $1, but a purchase price of $100. In March 1989, Bertsch, Hesch, Monnin and Watkins each purchased 2,000 shares of stock, leaving 20% of the outstanding stock available for plaintiff.

On December 1, 1989, a consent resolution was signed by plaintiff and defendant shareholders which stated that the original shareholders had contributed or agreed to contribute $1,800,000, part of which was to originally be treated as equity and part of which was to be treated as subordinated debt. The board determined that it would be better to convert this debt to equity so as to avoid any subordinated debt servicing obligations. Later that month, plaintiff decided to partially exercise his stock option and purchased 444.44 shares at a price of $225 per share.

ICC commenced operations in March 1989. A number of manufacturing problems developed, and many of the products manufactured were defective. In addition, a large quantity of products was produced but was not sold. Bertsch's affidavit stated that at a board meeting in June 1989, plaintiff assured the directors that he could sell everything in the warehouse practically overnight and that the company would be breaking even within months. Plaintiff said that he needed additional funds, and the directors agreed to put an additional $1 million into the corporation. The directors also instructed plaintiff to straighten

out the accounting department so that financial statements could be obtained.

The corporation continued to experience production problems and financial losses throughout the remainder of 1989. In December 1989, plaintiff sent a letter to the other directors attempting to explain the "larger than anticipated losses" and production problems. Nonetheless, plaintiff stated that the corporation was improving every day, and that business was getting better and "about to explode."

On January 19, 1990, a meeting was held at the South Carolina plant to try to solve ICC's problems. According to Bertsch, plaintiff did not recognize the existence of problems and continued to make excuses. At a formal board meeting on that date, plaintiff was asked to move back to Chicago and concentrate exclusively on sales. The board determined:

> "[Plaintiff] had done nothing to improve sales or cash flow since our June meeting, nor had he done anything concerning better financial information for himself or us. After looking over the plant and talking to many people it was apparent that [plaintiff] was not going to get the job done and that all we could look forward to was a call for more money in the future."

During the course of further investigation at the plant, the directors became aware of various ways in which plaintiff had mismanaged the plant. On February 16, 1990, a meeting was held because plaintiff had not sold much product, and the board was receiving threatening notes from him. The other directors attempted to discuss the seriousness of the company's financial situation with plaintiff. In response, plaintiff stated: "We have a great company, everything is going to be all right. Again, if you had left me alone and given me more money, it would have been all right."

A shareholder's meeting was held later that day. All other shareholders, except plaintiff, signed a waiver of notice of the meeting. However, plaintiff did not object to the meeting and he attended it. Plaintiff was not elected as either a director or officer for the following year.

Shortly thereafter, the board of directors decided by consent resolution that plaintiff should be terminated as director and president of ICC. The board provided written notice to plaintiff that his employment was terminated as of that date, February 23, 1990, because of his failure to complete his duties in accordance with the business plan. The board of directors authorized eight weeks' severance pay and discontinued plaintiff's insurance rights.

On March 5, 1990, a telephone conference was held between plaintiff and defendant shareholders for the purpose of reconsidering the termination of plaintiff's employment. Plaintiff was represented by counsel at this meeting. The shareholders upheld the termination.

Each defendant filed a supporting affidavit stating that he was not a resident of Illinois, that he did not transact any business in Illinois, and that he did not perform any of the enumerated acts under section 2—209 of the Illinois Code of Civil Procedure. Supplemental affidavits offered by defendants further indicated that any actions taken by them were made in a representative or fiduciary capacity as a shareholder of ICC.

The sole issue presented for review is whether defendants are subject to jurisdiction in Illinois under the long-arm statute. (Ill. Rev. Stat. 1989, ch. 110, par. 2—209.) That section provides in relevant part:

"§2—209. Act submitting to jurisdiction—Process.

(a) Any person, whether or not a citizen or resident of this State, who in person or through an agent does any of the acts hereinafter enumerated, thereby submits such person, and, if an individual, his or her personal representative, to the jurisdiction of the courts of this State as to any cause of action arising from the doing of any of such acts:

(1) The transaction of any business within this State;

(2) The commission of a tortious act within this State;

* * *

(7) The making or performance of any contract or promise substantially connected with this State;

* * *

(11) The breach of any fiduciary duty within this State;

* * *

(b) A court may exercise jurisdiction in any action arising within or without this State against any person who:

* * *

(4) Is a natural person or corporation doing business within this State." Ill. Rev. Stat. 1989, ch. 110, par. 2—209.

■ Initially we note that the burden of establishing personal jurisdiction rests with the party asserting the existence of jurisdiction. (*Kutner v. DeMassa* (1981), 96 Ill. App. 3d 243, 421 N.E.2d 231; *Mergenthaler Linotype Co. v. Leonard Storch Enterprises, Inc.* (1978), 66 Ill. App. 3d 789, 383 N.E.2d 1379.) In order to meet this burden, plaintiff must demonstrate that defendant committed one of the acts enumerated in the Illinois long-arm statute; his cause of action arose from the act; and

personal jurisdiction is consistent with due process. (*Loos v. American Energy Savers, Inc.* (1988), 168 Ill. App. 3d 558, 522 N.E.2d 841; *Kutner v. DeMassa*, 96 Ill. App. 3d 243, 421 N.E.2d 231.) The relevant inquiry in determining whether a nonresident defendant has the constitutionally requisite minimum contacts for personal jurisdiction to be asserted over him is whether the defendant engaged in some act or conduct by which he may be said to have invoked the benefits and protections of the law of the forum. (*Gray v. American Radiator & Standard Sanitary Corp.* (1961), 22 Ill. 2d 432, 176 N.E.2d 761.) The mere fact that a corporation by which a nonresident is employed, or in which he is a stockholder, is itself subject to Illinois jurisdiction does not subject that nonresident to jurisdiction. *Mergenthaler Linotype*, 66 Ill. App. 3d 789, 383 N.E.2d 1379.

■ In considering a challenge to its personal jurisdiction, a court may receive and weigh affidavits, and such conflicts as do exist in the affidavits and pleadings must be resolved in plaintiff's favor for purposes of determining whether a *prima facie* case for *in personam* jurisdiction has been established. (*Wessel Co. v. Yoffee & Beitman Management Corp.* (N.D. Ill. 1978), 457 F. Supp. 939, 940.) However, where well-alleged facts within an affidavit are not contradicted by counteraffidavit, they must be taken as true notwithstanding the existence of contrary averments in the adverse party's pleadings. *Central Clearing, Inc. v. Omega Industries, Inc.* (1976), 42 Ill. App. 3d 1025, 356 N.E.2d 852.

The essence of plaintiff's argument for his breach of contract claims is that the corporate veil should be pierced because each act of nonresident defendant shareholders described in the complaint was done on their own behalf and as agents for and in conspiracy and agreement with each other. In his complaint and affidavit, plaintiff alleges that the following acts committed by defendants took place in Illinois: (1) the stock option agreement was negotiated with plaintiff in Illinois by Hesch acting for ICC, and by Bertsch and Monnin making conference calls to plaintiff and Hesch in Illinois with Bertsch, Monnin and Hesch acting for ICC; (2) Bertsch's misrepresention of the amount of capital the shareholders would invest; (3) refusal to deliver additional shares of ICC stock was given on behalf of ICC in writing to plaintiff in Illinois; further, Bertsch and Watkins placed a call to plaintiff in Illinois in which they refused to issue more shares of stock; (4) plaintiff was fired in Illinois; (5) after plaintiff's termination, the parties agreed in Illinois that ICC would continue paying his medical insurance coverage if plaintiff paid the monthly costs to ICC; and (6) alleged defamatory statements made by Hesch that plaintiff was terminated because of his health were

made to customers and distributors in Illinois. (Hesch is not a party to this appeal.)

■ We find a brief review of the principles underpinning corporate law to be instructive. It is well established that a corporation is a legal entity which exists separate and distinct from its shareholders, officers, and directors, who are not, as a general rule, liable for the corporation's obligations. (*Stap v. Chicago Aces Tennis Team, Inc.* (1978), 63 Ill. App. 3d 23, 379 N.E.2d 1298; *Berlinger's, Inc. v. Beef's Finest, Inc.* (1978), 57 Ill. App. 3d 319, 372 N.E.2d 1043.) The rule applies even in instances of a so-called close corporation, one in which the stock is held in a few hands and is not frequently bought and sold. There is no specified or required minimum number of stockholders for a valid corporate existence and corporations with a single shareholder have received judicial sanction. *Amsted Industries, Inc. v. Pollak Industries, Inc.* (1978), 65 Ill. App. 3d 545, 382 N.E.2d 393.

■ A corporate entity will be disregarded and the veil of limited liability pierced where it would otherwise present an obstacle to the protection of private rights or where the corporation is merely the alter ego or business conduit of a governing or dominating personality. (*Gallagher v. Reconco Builders, Inc.* (1980), 91 Ill. App. 3d 999, 415 N.E.2d 560.) For the doctrine traditionally known as the "piercing of the corporate veil" to apply, two requirements must be met: first, there must be such unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist; and second, circumstances must be such that an adherence to the fiction of separate corporate existence would sanction a fraud or promote injustice. *Central States, Southeast and Southwest Areas Pension Fund v. Gaylur Products, Inc.* (1978), 66 Ill. App. 3d 709, 384 N.E.2d 123; *Stap v. Chicago Aces Tennis Team, Inc.*, 63 Ill. App. 3d 23, 379 N.E.2d 1298; *Berlinger's, Inc. v. Beef's Finest, Inc.*, 57 Ill. App. 3d 319, 372 N.E.2d 1043.

■ In this case, plaintiff failed to demonstrate that the corporate veil should be pierced and defendants subjected to personal jurisdiction. The record reveals that defendants entered into a joint venture to purchase the assets of Advance Cup Corporation, and became incorporated as a Delaware corporation licensed to transact business in South Carolina. The assets of Advance Cup were purchased for $1,300,000. We are unpersuaded by plaintiff's conclusory allegations that ICC was undercapitalized from its inception, for the total capital invested was $1,800,000, which appears adequate for a corporation of this size. The directors signed consent resolutions as required to resolve any significant problems confronting the corporation. We also note that there has

been no allegation of any commingling of funds between the shareholders and ICC, or that the shareholders have treated ICC's assets as their own.

At the first board meeting on February 20, 1989, ICC adopted its bylaws, elected directors and executed subscription agreements. Thereafter, the directors met on a regular basis to discuss the various manufacturing problems encountered by ICC. Corporate records and minutes of the meetings were also taken. While the notice requirements for certain meetings may not have been strictly adhered to in each instance, we do not find that fact, in itself, fatal to the corporate existence.

■ In sum, we find no evidence in the record to indicate that ICC did not have a separate ownership existence, or that it was merely the alter ego of defendant shareholders. In light of this determination, plaintiff's counts against nonresident appellees sounding in breach of contract for termination of the employment agreement, breach of stock option agreement and breach of contact for medical insurance must fail.

■ Moreover, we further find that defendants are not subject to personal jurisdiction through application of the fiduciary shield doctrine. The fiduciary shield doctrine provides that "if an individual has contact with a State only by virtue of his acts as a fiduciary of a corporation" (*Olinski v. Duce* (1987), 155 Ill. App. 3d 441, 443-44, 508 N.E.2d 398), such acts may not form the predicate for the exercise of jurisdiction over him as an individual. (*Hurletron Whittier, Inc. v. Barda* (1980), 82 Ill. App. 3d 443, 402 N.E.2d 840.) The foundation supporting this doctrine is that " 'it is unfair to force an individual to defend a suit brought against him personally in a forum with which his only relevant contacts are acts performed not for his own benefit but for the benefit of his employer.' " *Washburn v. Becker* (1989), 186 Ill. App. 3d 629, 632, 542 N.E.2d 764, quoting *State Security Insurance Co. v. Frank B. Hall & Co.* (N.D. Ill. 1981), 530 F. Supp. 94, 97.

In this case, all the acts complained of by plaintiff were undertaken by defendants in their representative or fiduciary capacity on behalf of the corporation, and not as part of a conspiracy or secret partnership. In his complaint, plaintiff admits that the stock option negotiations made in Illinois by Bertsch and Monnin were made while acting for ICC. Too, any representations concerning the amount of equity that would be invested in ICC were made for the benefit of the corporation and not defendants. We also find that plaintiff's complaint alleging that Bertsch and Watkins placed a conference call to plaintiff in Illinois in which they refused to allow ICC to deliver more shares of stock to plaintiff was also made in their fiduciary capacity as shareholders of ICC and is thus not actionable against them personally. Assuming that these acts may in fact

subject a foreign corporation such as ICC to Illinois jurisdiction, we still need not conclude that an employee, shareholder, president, or member of the board of directors of that corporation is also subject to Illinois jurisdiction. *Olinski v. Duce*, 155 Ill. App. 3d 441, 508 N.E.2d 398; *Illinois National Bank & Trust Co. v. Gulf States Energy Corp.* (1981), 102 Ill. App. 3d 1113, 429 N.E.2d 1301.

■ We turn now to plaintiff's contention that jurisdiction exists because of the breach of fiduciary duty claim. Plaintiff maintains that by virtue of their majority ownership of ICC, defendants owed him and other minority shareholders a duty to act fairly with them. Plaintiff alleges that defendants breached this duty by wrongfully valuing and issuing stock to themselves without proper board action. In addition, plaintiff's wrongful termination prevented him from purchasing more stock. Plaintiff argues that the breach of fiduciary duty constitutes a tortious act in Illinois.

However, in *Young v. Colgate-Palmolive Co.* (7th Cir. 1986), 790 F.2d 567, it was determined that the situs of the tort is the place where directors took board action, and the fact that shareholders might have been injured in Illinois by the allegedly tortious act did not mean that the tort was committed in Illinois for purposes of long-arm jurisdiction. "[T]he place of a wrong is where the last event takes place which is necessary to render the actor liable." (*Green v. Advance Ross Electronics Corp.* (1981), 86 Ill. 2d 431, 437, 427 N.E.2d 1203.) In view of the fact that the board action which plaintiff complains of occurred in South Carolina and not in Illinois, we do not find that the alleged breach of fiduciary duty subjects defendants to Illinois jurisdiction.

Plaintiff next asserts that defendants interfered with his employment, stock option and medical insurance contracts by causing wrongful termination. He again argues that his employment and stock option contracts were terminated in Illinois by Hesch; also, that he received written notice from ICC's counsel of the termination of all three contracts. However, as previously discussed, the actions taken by defendants and their counsel were in their capacity as representatives of ICC, and do not provide a proper basis for personal jurisdiction in Illinois.

■ In the counts alleging invasion of privacy and defamation, plaintiff argues that defendants falsified the circumstances of the termination of plaintiff's employment by making false statements about his health. Plaintiff claims that the circumstances of his termination and health are matters about which he has a legitimate expectation of privacy, and that the dissemination of said information precluded him from obtaining other employment.

In his affidavit, plaintiff attributes the defamatory statements to Hesch, who is a resident of Illinois and not a party to this appeal. Defendants have each specifically denied making such a statement. Thus, plaintiff must demonstrate the existence of a conspiracy in order to justify attributing these alleged statements to defendants for jurisdictional purposes, which he has failed to do.

Finally, plaintiff charges defendants with common law and securities fraud by making false statements about the capitalization of ICC to induce plaintiff into entering the stock option agreement. Plaintiff again relies upon representations made by Bertsch and Hesch in conference calls made to him while he was in Illinois. As heretofore discussed, these statements were made by defendants as representatives of ICC, and not in furtherance of their own personal interests.

For the reasons stated, the judgment of the circuit court of Cook County is affirmed.

Judgment affirmed.

EGAN,* P.J., and RAKOWSKI, J., concur.

---

*Justice Rosemary LaPorta participated in oral argument prior to her death. Presiding Justice Edward J. Egan was substituted on the panel and has listened to the oral argument tape and has read the briefs.